**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No: 18-cv-03305-CMA-KMT

VDARE FOUNDATION,

                Plaintiff,

v.                                                                          **JURY TRIAL DEMANDED**

CITY OF COLORADO SPRINGS,
JOHN SUTHERS,

                Defendants.

**FIRST AMENDED COMPLAINT**

1.      This action arises out of the refusal of defendants, the City of Colorado Springs, CO and its Mayor, John Suthers (Defendants) to provide city services, including police protection, for the Immigration Reform Conference ("Conference") that Plaintiff, VDare Foundation ("VDARE" or "Plaintiff") planned to host at the Cheyenne Mountain Resort.  After the Conference became the subject of negative media attention, threats and planned protests, Defendants announced that they would not provide "any support or resources," for the Conference and its attendees, denouncing the event as "hate speech." Defendants' refusal to provide city services led to the Conference being cancelled. Defendants' actions deprived Plaintiff of its First Amendment rights to freedom of speech and assembly in violation of 42 U.S.C. § 1983, and intentionally interfered with their contract with the Resort.

**I. THE PARTIES**

2. VDARE is a non-profit educational organization that is exempt from federal income taxation under IRC section 501(c)(3). It is based in Connecticut, and its address is P.O. Box 211, Litchfield, CT 06759. As is stated on the "about" page of its website (https://vdare.com/about), VDARE's mission is education on two main issues: first, the unsustainability of current U.S. immigration policy and second, whether the U.S. can survive as a nation-state. VDARE does this through VDARE.com, VDARE Books, and through public speaking, conferences, debates and media appearances.

3. VDARE's founder, Peter Brimelow, is a well-known magazine editor, political commentator, columnist and author. During the course of a long career that spans five decades, he has served as an editor and writer at the *Wall Street Journal*, *Financial Post*, *Macleans*, *Barrons, Fortune*, *Forbes*, *National Review*, and *MarketWatch*. He is a recipient of the Gerald Loeb Award for Distinguished Business and Financial Journalism, was a media fellow at the Hoover Institution, and has been described as "a star of the conservative movement in the 2000's."[1] He is the author of four well-regarded books, including *Alien Nation: Common Sense About America's Immigration Disaster* (1995), a national bestseller in the U.S., and *The Patriot Game: National Dreams and Political Realities* (1986), a book on Canadian politics that is credited with spurring the creation of the Reform Party of Canada in 1987 and exercising a profound influence on future Prime Minister Stephen Harper; *The Wall Street Gurus: How You Can Profit from Investment Newsletters*; and *The Worm in the Apple: How the Teacher Unions Are Destroying American Education.*

4. Since 1999, VDARE has published data, analysis and editorial

---

[1] Mathew Hayday, *So They Want Us to Learn French: Promoting and Opposing Bilingualism in English-Speaking Canada* (UBC Press 2015), at p. 176.

commentary from a wide variety of writers of every race, religion, nationality and political affiliation who oppose current U.S. immigration policy and argue for immigration control and reform. In doing so, VDARE seeks to influence public debate and discussion on the issues of immigration and the future of the United States as a viable nation-state. It has never advocated violence or any form of illegality. Its founder, Mr. Brimelow, is an immigrant, and its managing editor, James Fulford, is a foreign national. It counts foreign nationals, immigrants and members of racial and ethnic minorities among its strongest supporters, donors and contributors. It has published on the negative effect of uncontrolled immigration on racial minorities, including recently arrived immigrants. VDARE's editorial perspective in favor of limiting immigration is essentially the same as the position set forth by now-President Donald Trump in his August 15, 2015, speech on the issue.

5. Defendant, the City of Colorado Springs, is a Colorado home rule municipality.

6. Defendant John Suthers is the Mayor of Colorado Springs, CO. He is being sued in his personal capacity. Upon information and belief, he is a citizen and resident of Colorado. At all times relevant to this Complaint, he acted under color of Colorado and City of Colorado Springs law, in the course of his official duties, and pursuant to an official custom, policy or practice of the City of Colorado Springs.

## II. JURISDICTION AND VENUE

7. This Court has personal jurisdiction over Defendants because they have minimum contacts with the State of Colorado.

8. Jurisdiction is proper pursuant to 28 U.S.C. § 1343 and 28 U.S.C. § 1331, as this action involves claims arising out of the Constitution, laws and/or treaties of the United States.

9. Venue is proper in this District pursuant to 28 U.S.C. 1391(a)(2) because a substantial part of the events giving rise to the claim took place in this District.

10. On or about February 9, 2018, VDARE, through its attorney, provided formal notice to Defendants of its claim.

### III. FACTUAL ALLEGATIONS

11. On or about March 31, 2017, VDARE reserved the Cheyenne Mountain Resort for a conference event featuring guest speakers and activities of interest and learning on subjects related to its mission.  Cheyenne Mountain Resort was fully aware of VDARE and its mission, as well as the potential for media attention and possible protests arising from the Conference.

12. On August 14, 2017, Mayor John Suthers and the City of Colorado Springs issued a public statement referencing the announcement of VDARE's conference saying that:

> The City of Colorado Springs does not have the authority to restrict freedom of speech, nor to direct private businesses like the Cheyenne Mountain Resort as to which events they may host.  That said, I would encourage local businesses to be attentive to the types of events they accept and the groups that they invite to our great city.
>
> The City of Colorado Springs will not provide any support or resources to this event, and does not condone hate speech in any fashion.  The City remains steadfast in its commitment to the enforcement of Colorado law, which protects all individuals regardless of race, religion, color, ancestry, national origin, physical or mental disability, or sexual orientation to be secure and protected from fear, intimidation, harassment and physical harm.

13. The provisions of this statement indicating that "The City of Colorado

Springs will not provide any support or resources to this event" amounted to a refusal to provide city services, including police protection, for the Conference due to, among other things, its controversial subject matter, VDARE's controversial viewpoints and published content in opposition to current immigration policies, which Defendants termed "hate speech," and the negative media attention that the Conference had attracted. The fact that Defendants' statement was an announcement that it would not provide police protection is confirmed by a statement attributed by a reporter from Channel 7 in Denver, Colorado to the El Paso County Sheriff's Office that "its deputies would not be participating either unless their presence is requested by the Colorado Springs Police Department for some reason."[2]

14. The very next day, August 15, 2017, Cheyenne Mountain Resort issued a statement announcing that it would not host VDARE's Conference and cancelled its contract with VDARE. Up until Defendants' statement, Cheyenne Mountain Resort had been actively communicating and coordinating with VDARE about logistics and safety in connection with the Conference. In a subsequent published interview, Suthers publicly expressed satisfaction that the Conference had been cancelled.

15. Defendants were acutely aware that the mission and ideas of VDARE can be considered controversial. Defendants targeted VDARE for denial of city services, including police protection, because of its controversial ideas, mission and viewpoint.

16. Defendants decried VDARE and its planned Conference as "hate speech" and declared that the City of Colorado Springs would refuse to provide city services if VDARE held its Conference at the Cheyenne Mountain Resort as planned. In doing so,

---

[2] Blair Miller, *Colorado Springs Mayor won't commit city assistance to upcoming white nationalist conference,* thedenverchannel.com, August 15, 2017.

Defendants acted pursuant to an official policy, custom or practice of refusing to "provide any support or resources," including police and fire services, parking, security and other basic municipal services, for any organizations, individuals or events they deem to practice, engage in or include "hate speech," as well as to individuals who wish to listen to such messages or participate in conferences, panels, demonstrations or other events that Defendants deem to include "hate speech" (hereinafter, the "Hate Speech Policy").

17.  Defendants intended to deprive VDARE of its rights under the First Amendment to freedom of speech, assembly and association. Given the nature of VDARE's work, and the controversy that it sometimes generates, Defendants either knew or should have known that VDARE's planned Conference might give rise to protests or unrest by those who may not agree with VDARE's purpose, viewpoints or statements. Defendants' promise that the City would not provide "any support or resources" to the Conference, given the obvious and foreseeable need for municipal police and fire services, had the effect of depriving VDARE of its First Amendment rights, chilling its speech on matters of public concern, and depriving VDARE and potential attendees of the Conference from communicating on important national issues such as immigration control and reform. By refusing to provide basic safeguards for the Conference in order to protect event sponsors and participants, Defendants deprived the Conference's sponsors and participants of their rights to peaceably assemble and debate issues of importance to themselves, to their community, and to the country as a whole.

## IV. LEGAL CLAIMS

### COUNT ONE: VIOLATION OF 42 U.S.C. § 1983

18.  Plaintiff re-alleges each and every allegation contained in the preceding

paragraphs with the same force and effect as if they were fully set out herein.

19. The actions of Defendants as described herein, while acting under color of state law, intentionally deprived Plaintiff of the securities, rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, including the rights to freedom of speech and freedom of association as guaranteed by the First Amendment to the Constitution of the United States of America, equal protection of the laws as guaranteed by the Fourteenth Amendment to the Constitution of the United States of America, and 42 U.S.C. §1983, in that Defendants unlawfully threatened to withhold city services based upon Plaintiff's speech and associations.

20. Defendants' actions, as described above, were objectively unreasonable in light of the facts and circumstances confronting them.

21. Defendants' actions, as described above, were motivated by an intent to harm Plaintiff.

22. Defendants' actions, as described above, were undertaken intentionally, willfully, and wantonly. Defendants' announcement that they would not provide any municipal resources or support of any kind, including basic police, fire, ambulance, parking and security services, meant that participants in the Conference, the Resort's patrons and employees, and innocent bystanders would potentially be subjected to serious injury or death in the event that they were threatened or attacked by protestors. In addition, the Resort would be powerless to stop protestors from destroying its property, harassing or injuring its patrons, or disrupting its business operations. Defendants knew that their conduct violated Plaintiff's First Amendment rights and placed the rights and safety of conference-goers and the Resort's patrons and employees at serious risk. They

7

intentionally, recklessly and heedlessly disregarded this risk.

23.     Defendants' conduct violated clearly established rights belonging to Plaintiff of which reasonable persons knew or should have known.

24.     At all times, Defendants acted pursuant to their Hate Speech Policy, which was an official policy, custom or practice of the City of Colorado Springs.  The Hate Speech Policy was not content-neutral either facially or in its application.  Instead, it targeted events, groups, and individuals for disfavored treatment based on the content of their speech.

25.     There were no narrowly drawn, reasonable and definite standards guiding the discretion of City officials pursuant to the Hate Speech Policy.  Moreover, this policy permitted the City to impose a "heckler's veto" on speech, based purely on the reaction (or anticipated reaction) of the public and/or certain listeners to the speech.

26.     Plaintiff was targeted pursuant to this policy based on its speech, in violation of the First Amendment to the United States Constitution.  It was also targeted based on its perceived or actual affiliations or associations, also in violation of the First Amendment.  Defendants refused to "provide any support or resources" to Plaintiff and its Conference based on the content of VDARE's message and associations, and the viewpoints and messages that they believed would be expressed at the Conference.  As a result of Defendant's conduct, Plaintiff was deprived of its ability to lawfully and peaceably assemble with its invited guest speakers, readers, supporters, and other interested persons.

27.     Defendants also refused to "provide any support or resources" to Plaintiff and its Conference based on the perceived reaction of the public and/or individual

listeners to VDARE's viewpoints and the perceived viewpoints and messages that would be expressed at the Conference.

28.     Defendants' refusal to "provide any support or resources" to Plaintiff and its Conference was not based on any objective factors or articulated standards. Defendants provided no reasoned explanation for their absolute refusal to provide any municipal resources or support of any kind, including police, fire, ambulance, parking, and security services, other than antipathy for the content of VDARE's message and viewpoints.

29.     As a result of Defendants' unlawful actions, Plaintiff has suffered damages, including deprivation of its First Amendment rights of free speech, assembly and association, loss of revenue from the planned conference, and negative publicity. Plaintiff has also suffered continuing loss and injury as a result of Defendants' unlawful actions. Defendants' actions have made it impossible for VDARE to conduct future conferences, discussions and events in Colorado Springs, as Defendants have made clear their position that VDARE, its sponsors and other associated individuals enjoy a disfavored status under the law.

30.     Defendants acted with the specific intention of depriving Plaintiff of its constitutional rights to freedom of speech, association and assembly.

31.     Defendants knew, or should have known, that their actions violated clearly established federal law. The Tenth Circuit has stated:

> "Government actions that 'may have the effect of curtailing the freedom to associate [have been] subject to the closest scrutiny,' since at least 1958 when the Supreme Court decided *NAACP v. Alabama*, 357 U.S. at 460-61. See also *NAACP v. Button*, 371 U.S. at 428-29, and cases discussed in Part II-B, supra. As stated by the District of Columbia Circuit in 1984: 'the constitutional right of association of the kind in which plaintiffs were

engaged was well known, as was the degree of protection from direct interference that such lawful association was to be accorded.' *Hobson v. Wilson*, 737 F.2d 1, 29 (D.C. Cir. 1984), *cert. denied sub nom. Brennan v. Hobson*, 470 U.S. 1084 (1985)." *Nat'l Commodity & Barter Ass'n v. Archer*, 31 F.3d 1521, 1533 (10th Cir. 1994).

In *Hobson*, the D.C. Circuit stated:

"As of 1967, the existence of a First Amendment right of association for lawful purposes was beyond dispute and its broad contours were quite clear. A line of Supreme Court cases had expressly established first, that Government cannot constitutionally punish membership in or association with any organization, absent clear proof that a person specifically intends to accomplish the illegal aims of the organization, *see Scales v. United States*, 367 U.S. 203, 228-30 (1961); *Noto v. United States*, 367 U.S. 290, 299-30 (1961); second, that Government cannot constitutionally punish individual or group advocacy of any position, unless it amounts to incitement to lawless action, see *Bond v. Floyd*, 385 U.S. 116 (1966); *Yates v. United States*, 354 U.S. 298 (1957); and third, that lawful associations and their members have the right to be protected from facially legitimate Government actions that would deter membership or otherwise thwart their efforts to associate and petition the Government for redress of their grievances." *Hobson*, 737 F.2d 1, 27-28.

32. The U.S. Supreme Court has "held time and again: 'Regulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment.'" *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 135 (1992) (quoting *Regan v. Time, Inc.*, 468 U.S. 641, 648-649 (1984)). In this case, Defendants' statement, directly cited the content of Plaintiff's speech as the reason that "[t]he City of Colorado Springs will not provide any support or resources to this event."

33. Moreover, Defendants did not identify any standards for how it came to the conclusion that Plaintiff had or would engage in "hate speech," or how it would identify future events supposedly containing "hate speech" to which it would "not provide any support or resources." As in *Forsyth*, "There are no articulated standards

10

either in the ordinance or in the [city's] established practice." 505 U.S. at 133. Moreover, also like *Forsyth*, in this case "[t]he administrator is not required to rely on any objective factors. He need not provide any explanation for his decision, and that decision is unreviewable." *Id*. And in this case, like *Forsyth*, "[n]othing in the law or its application prevents the official from encouraging some views and discouraging others" by using the Hate Speech Policy. *Id*. "The First Amendment prohibits the vesting of such unbridled discretion in a government official." *Id*.

34. This case is also similar to *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963). There, the Rhode Island legislature had established the "Rhode Island Commission to Encourage Morality in Youth." The Commission would notify private booksellers on official stationery that certain books and magazines were found to be "objectionable" for sale, distribution or display to youths under the age of 18. The letter would thank the bookseller in advance for its cooperation and remind it that the Commission had the duty to recommend prosecution for purveyors of "obscenity." Similar to this case, where the Resort almost canceled Plaintiff's conference the very next day, in *Bantam Books* the bookseller's "reaction on receipt of a notice was to take steps to stop further circulation of copies of the listed publications." *Id*. at 63. Like Defendants here, the defendants in *Sullivan* argued that their notices did not violate the First Amendment because they did "not regulate or suppress obscenity but simply exhort[ed] booksellers and advise[d] them of their legal rights." *Id*. at 66. The U.S. Supreme Court noted that "the Commission is limited to informal sanctions," that a bookseller was "was 'free' to ignore the Commission's notices, in the sense that his refusal to 'cooperate' would have violated no law," and "appellants' books have not been

11

seized or banned by the State, and that no one has been prosecuted for their possession or sale." *Id*. at 67, 68. Nonetheless, it found that the informal blacklisting of certain books still violated the First Amendment: "It would be naive to credit the State's assertion that these blacklists are in the nature of mere legal advice, when they plainly serve as instruments of regulation independent of the laws against obscenity." *Id*. at 68-69. Indeed, "The Commission's practice . . . provides no safeguards whatever against the suppression of nonobscene, and therefore constitutionally protected, matter. It is a form of regulation that creates hazards to protected freedoms markedly greater than those that attend reliance upon the criminal law." *Id*. at 70. The U.S. Supreme Court continued:

> "What Rhode Island has done, in fact, has been to subject the distribution of publications to a system of prior administrative restraints, since the Commission is not a judicial body and its decisions to list particular publications as objectionable do not follow judicial determinations that such publications may lawfully be banned. Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity. *See Near v. Minnesota*, 283 U.S. 697 (1931); *Lovell v. Griffin*, 303 U.S. 444, 451 (1938); *Schneider v. State*, 308 U.S. 147, 164 (1939); *Cantwell v. Connecticut*, 310 U.S. 296, 306 (1940); *Niemotko v. Maryland*, 340 U.S. 268, 273 (1951); *Kunz v. New York*, 340 U.S. 290, 293 (1951); *Staub v. Baxley*, 355 U.S. 313, 321 (1958). We have tolerated such a system only where it operated under judicial superintendence and assured an almost immediate judicial determination of the validity of the restraint. *Kingsley Books, Inc., v. Brown*, 354 U.S. 436 (1957). The system at bar includes no such saving features. On the contrary, its capacity for suppression of constitutionally protected publications is far in excess of that of the typical licensing scheme held constitutionally invalid by this Court. There is no provision whatever for judicial superintendence before notices issue or even for judicial review of the Commission's determinations of objectionableness. The publisher or distributor is not even entitled to notice and hearing before his publications are listed by the Commission as objectionable. Moreover, the Commission's statutory mandate is vague and uninformative, and the Commission has done nothing to make it more precise. Publications are listed as 'objectionable' without further elucidation." *Id*. at 70-71.

This case is on all-fours with *Bantam Books*. Although the first paragraph of the statement of The City of Colorado Springs in this case purports to exhort "private businesses like the Cheyenne Mountain Resort" to "be attentive to the types of events they accept and the groups that they invite to our great city," the second paragraph announced that "[t]he City of Colorado Springs will not provide any support or resources to this event." The plain meaning of this statement was that no municipal services of any sort, including basic police or fire services, would be provided in the event they were needed, and that was exactly how the statement was interpreted by the El Paso County Sheriff's Office, which stated that "its deputies would not be participating <u>either</u> unless their presence is requested by the Colorado Springs Police Department for some reason." (emphasis added). Thus, Defendants' statement created exactly the sort of "informal blacklist" of certain types of speech that was prohibited by the Supreme Court over 54 years ago in *Bantam Books*.

## COUNT TWO: FIRST AMENDMENT RETALIATION

35. Plaintiff re-alleges each and every allegation contained in the preceding paragraphs with the same force and effect as if they were fully set out herein.

36. A claim of retaliation for exercise of First Amendment rights requires proof of three elements: 1) that the plaintiff was engaged in constitutionally protected activity; 2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary fitness from continuing to engage in that activity; and 3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.[3]

---

[3] *Worell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000).

37. Plaintiff here has a long history of engaging in activity protected by the First Amendment, including publishing, speaking, and engaging in debate. As a direct result of Plaintiff's prior speech, Defendants characterized Plaintiff's constitutionally protected activity as "Hate Speech," and urged local businesses to "be attentive to the types of events that they accept and the groups that they invite to our great city." These statements by Defendants directly link Plaintiff's speech to Defendants' motivations for their action.

38. Defendants furthermore stated that "The City of Colorado Springs will not provide any support or resources to this event." This decision by Defendants is an injury that certainly would chill a person of ordinary firmness from continuing to engage in this type of constitutionally protected activity in Colorado Springs, knowing that the City would not provide necessary city services for an event or group of whom they disapprove, solely because of the content of their speech. As a result of Defendants' expressed disapproval of Plaintiff's speech and their expressed intention to take action against their speech, Plaintiffs have not attempted to arrange another conference to engage in such activity in Colorado Springs.

39. As a result of Defendants' unlawful actions, Plaintiff has suffered damages, including deprivation of its First Amendment rights of free speech, assembly and association, loss of revenue from the planned conference, and loss of revenue from negative publicity due to the conference's cancellation. Plaintiff has also suffered continuing loss and injury as a result of Defendants' unlawful actions. Defendants' actions have made it impossible for Plaintiff to conduct future conferences, discussions and events in Colorado Springs, as Defendants have made clear their position that

VDARE, its sponsors and other associated individuals enjoy a disfavored status under the law and would not be provided any city services, including police, fire or ambulance services, if they attempted to host a conference or other gathering or event within the city.

**COUNT THREE: INTENTIONAL INTERFERENCE WITH CONTRACT**

40. Plaintiff re-alleges each and every allegation contained in the preceding paragraphs with the same force and effect as if they were fully set out herein.

41. On or about March 31, 2017 Plaintiff and Cheyenne Mountain Resort entered into a written contract under which the Resort would host VDARE's Immigration Reform Conference.

42. Defendants knew, or should have known, of this contract. Indeed, Defendants' August 14, 2017 statement makes explicit reference to the Cheyenne Mountain Resort as a "private business," and noted its decision to host Plaintiff's Immigration Reform Conference.

43. In an interview published on August 17, 2018, Mayor Suthers expressed satisfaction that the Resort had cancelled its contract to host Plaintiff's Immigration Reform Conference. He was quoted as saying that "the city can't tell private entities who they can contract with," but that "I would appreciate if organizations in Colorado Springs do a little bit of due diligence before they contract with groups, if it's the type of folks that could generate controversy and [could] be bad for their business and the community's business." He was also quoted as saying that he felt "fairly confident" that the Resort "didn't know the nature of VDARE when it accepted the booking."

44. These statements demonstrate both that Defendants were specifically aware of the Resort's contract with Plaintiff, and that they issued the August 14, 2017 statement that "[t]he City of Colorado Springs will not provide any support or resources

15

to this event" with the specific intention of having the Resort cancel its contract with Plaintiff.

45.	The statements also illustrate that Defendants used improper means to pressure the Resort into cancelling its contract with Plaintiff. Mayor Suthers knew that "the city can't tell private entities who they can contract with." Nonetheless, Defendants issued a statement on behalf of the City of Colorado Springs that left the Resort no choice but to break its contract with Plaintiff by stating that the City of Colorado Springs would withhold all city services from the Conference. This included police protection that might be needed in the event of violence or threats directed at participants in the Immigration Reform Conference, the Resort itself, or patrons and employees at the Resort.

46.	This statement effectively made performance of the contract impossible. Defendants' announcement meant that the Resort would be placing its patrons and employees at risk of serious injury or even death if it honored the terms of its contract with Plaintiff. The Resort would be powerless to stop protestors from destroying its property, harassing or injuring its patrons, or disrupting its business operations in the event it honored its agreement to host the Conference. It would be placing itself at a substantial risk of tort or potentially even criminal liability if it proceeded to host the Conference while knowing that basic city services would not be provided in the event they were needed.

47.	Defendants' means were additionally improper because they placed participants in the Conference, the Resort's patrons and employees, and innocent bystanders at risk for serious injury or death in the event that they were threatened or

attacked by protestors. They also created a substantial and unnecessary risk that the Resort would be subjected to property damage, that Conference participants and the Resort's patrons and employees would be harassed, injured or threatened, and that the Resort's business operations would be disrupted.

48. Defendants' means were improper because they targeted Plaintiff and participants and attendees at its planned Conference for discriminatory treatment based on antipathy for the content of Plaintiff's message and viewpoints and its exercise of its First Amendment rights. Defendants acted out of animus towards Plaintiff's viewpoints and a desire to stamp out public discussion and debate. In so doing, they brought the power of the government to bear against Plaintiff's fundamental rights of freedom of speech, association and assembly, as well as its right to contract with the Resort or any other business in the City of Colorado Springs.

49. As a result of Defendants' unlawful actions, Plaintiff has suffered damages, including loss of revenue from the planned conference, loss of revenue from negative publicity due to conference's cancellation. Plaintiff has also suffered continuing loss and injury as a result of Defendants' unlawful actions. Defendants' actions have made it impossible for Plaintiff to conduct future conferences, discussions and events in Colorado Springs, as Defendants have made clear their position that VDARE, its sponsors and other associated individuals enjoy a disfavored status under the law, that private businesses should not enter into contracts with VDARE, and that businesses who do contract with VDARE may be subjected to threats, retaliation, and denial of city services.

## V. PRAYER FOR RELIEF

50.     Plaintiff demands such legal or equitable relief as provided by law, including, but not limited to, the following:

a. Compensatory damages of $1,000,000;

b. Punitive damages in an amount to be determined at trial;

c. Presumed damages;

d. A declaration that Defendants' conduct violated Plaintiff's First Amendment rights and intentionally interfered with their contract with the Resort;

e. An injunction forbidding Defendants from denying municipal services to entities or events based on their controversial viewpoints and affiliations;

f. Reasonable attorney fees and costs in bringing this action;

g. Prejudgment interest; and

h. Any other relief that this Court deems just and equitable.

Dated: March 22, 2019

Respectfully submitted,

*/s/ Randy B. Corporon*

Randy B. Corporon, Colorado Reg. # 29861
LAW OFFICES OF RANDY B. CORPORON, P.C.
2821 S. Parker Rd., Ste. 555
Aurora, CO 80014
Tel: (303) 749-0062
Fax: (720) 836-4201
rbc@corporonlaw.com
**Attorneys for Plaintiff**